UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

                                      Chapter 7

RAFAEL LOZADA,

                                      Case No. 17-11721 (SMB)

                        Debtor.

-----------------------------------------------------------------x

RAFAEL LOZADA,

                          Plaintiff,               Adv. Pro. No. 17-01116 (MKV)

        v.

EDUCATIONAL CREDIT
MANAGEMENT CORPORATION,

                          Defendant.

-----------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER
## <u>DENYING DISCHARGE OF DEBTOR'S STUDENT LOAN DEBT</u>

APPEARANCES:

LAW OFFICE OF NATALIE JEAN-BAPTISTE, P.C.
*Plaintiff Rafael Lozada*
626 RXR Plaza
6th Floor
Uniondale, NY 11556
By:    Natalie Jean-Baptiste

LAW OFFICES OF KENNETH L. BAUM
*Counsel to Defendant Educational Credit Management Corporation*
167 Main Street
Hackensack, N.J. 07601
By:    Kenneth L. Baum

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**

Rafael Lozada ("Lozada" or "Plaintiff") commenced this action, pursuant to 11 U.S.C. § 528(a)(8) and Federal Rule of Bankruptcy Procedure 7001(6), seeking a judgment declaring that it is an undue hardship for Mr. Lozada to repay the student loan debts he owes to Educational Credit Management Corporation ("Defendant" or "ECMC") and the debts are therefore dischargeable. While the Court is not unsympathetic to Mr. Lozada's situation, the law does not permit granting him the relief he seeks based on the factual record. Accordingly, for the reasons set forth below, the Court finds that Mr. Lozada's student loans are not dischargeable.

## JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Both parties have consented to the entry of a final order or judgment by this Court. Pre-Trial Order [ECF No. 26], Jurisdiction ¶ 1.

## PROCEDURAL BACKGROUND

Mr. Lozada petitioned this Court for relief pursuant to chapter 7 of the Bankruptcy Code on June 20, 2017. Thereafter, he commenced this adversary proceeding seeking to discharge his student loan debt. Pursuant to the Court's individual practice rules, in advance of the trial, the Parties submitted a proposed Pre-Trial Order, which the Court entered on August 7, 2018. [ECF No. 26]. The Pre-Trial Order include, *inter alia*, the facts to which the parties stipulated.

Mr. Lozada stipulated pre-trial to facts that seriously called into question his ability to demonstrate undue hardship. Nevertheless, the Court accepted testimony and documentary

evidence at trial to give Mr. Lozada the opportunity to supplement the seemingly conclusive

stipulated facts. The Court conducted a trial on August 21, 2018, at which the Court received

evidence and heard argument from the parties.  Thereafter, the Parties submitted post-trial briefs.

Def.'s Post-Trial Brief [ECF No. 30]; Pl.'s Post-Trial Brief [ECF No. 31].[1]

## FACTUAL BACKGROUND

The relevant facts are, for the most part, stipulated and are not otherwise in significant

dispute.  As reflected in the Pre-Trial Order, dated August 7, 2018, the parties stipulated to the

following facts:

1. Plaintiff is an individual residing at 25 Glenbeck Row, Stamford, Connecticut.

2. ECMC is a not-for-profit corporation duly organized under the laws of the State of
   Minnesota, with offices located at 111 South Washington Avenue, Suite 1400,
   Minneapolis, Minnesota 55401.

3. ECMC, a federal student loan guarantor in the Federal Family Education Loan Program
   ("FFELP"), holds an interest in one (1) unpaid student loan pertaining to Plaintiff (the
   "Educational Credit Management Corporation Loan")

4. The ECMC Loan is a federal consolidation loan under FFELP.

5. The loans underlying the ECMC Loan include, *inter alia*, loans obtained to finance
   Plaintiff's education at Brooklyn Law School and the education of an individual other
   than Plaintiff at St. John's University.

6. As of July 24, 2018, the outstanding balance of the ECMC Loan, including principal,
   interest, fees, and costs, was approximately $337,980.04.  In addition, the ECMC Loan
   accrues interest at a rate of 8.25% per annum, or $71.63 *per diem*.

7. Plaintiff is 67 years old.

8. Plaintiff is married and has no dependents.

9. Plaintiff has retired from working.

10. Plaintiff lives with his wife, a retired school teacher.

---

[1] Although Plaintiff submitted his brief after the November 2 filing deadline, the Court has considered each party's
post-trial submission.

11. Plaintiff's sole source of income is Social Security income.

12. Plaintiff's monthly social security benefits total approximately $1,219.00.

13. Plaintiff is able to drive an automobile.

14. Plaintiff holds a Bachelor of Arts degree from City College of New York and a Juris Doctorate from Brooklyn Law School.

15. Plaintiff entered law school at the age of 38.

16. Plaintiff has never passed any bar exam or been admitted to practice law.

17. After failing the New York bar exam on his first attempt, Plaintiff decided not to take another bar exam or pursue any type of career in the legal industry.

18. Plaintiff has held various positions in the social service and non-profit sectors, and has worked within the government in support of non-profit initiatives, often at a supervisory or director level.

19. Plaintiff has earned as much as $75,000.00 per year.

20. Plaintiff had an annual salary of $70,000.00 as recently as 2013.

21. Plaintiff has been unemployed since 2014.

22. Plaintiff has not attempted to find employment since January 2015.

23. Plaintiff is able to use a computer to perform tasks including conducting research on the internet, using e-mail, and creating documents.

24. Plaintiff has not considered seeking employment in a position that would not place a physical strain on him.

25. Plaintiff sought and was granted several deferments and forbearances from his obligation to pay his federal student loans (the "Deferments and Forbearances").

26. Between April 2005 and May 2017, Plaintiff had Deferments and Forbearances totaling 80 months.

27. Between July 2013 and May 2017, Plaintiff had Deferments and Forbearances for all but three (3) months.

28. Plaintiff consolidated his federal student loans into the ECMC Loan in March 2002.

29. Plaintiff pays his granddaughter a weekly allowance of $25-30.

4

30. Plaintiff's bank statements from his joint checking account with his wife reflect numerous payments to his adult children on a regular basis, although Plaintiff is unsure of the reason(s) for such payments.

31. Plaintiff's bank statements from his joint checking account with his wife reflect numerous, regular visits to restaurants.

32. Plaintiff and his wife regularly contribute at least ten percent (10%) of their total income toward charitable contributions and religious donations.

33. Plaintiff and his wife made charitable contributions and religious donations totaling $23,510 in 2016, $21,544 in 2015, $21,866 in 2014, $24,783 in 2013, and $12,678 in 2012.

34. Plaintiff refuses to reduce the amount of charitable contributions and religious donations he and his wife make every year, even if doing so would allow him to repay the ECMC Loan to some extent.

35. Plaintiff and his wife received the following federal income tax refunds: $4,609 for 2016; $5,037 for 2014; $3,852 for 2013; and $2,676 for 2012 (collectively, the "Tax Refunds").

36. No portion of the Tax Refunds were used to repay the ECMC Loan.

37. Plaintiff inherited approximately $30,000 from his mother in 2015 but did not use any of that money to repay the ECMC Loan.

38. Plaintiff and his wife receive total net income of no less than $5,942 per month.

39. Plaintiff is eligible to enter the William D. Ford Direct Loan Consolidation Program (the "Ford Program") in order to achieve greater flexibility in repaying his unpaid student loan pertaining to Educational Credit Management Corporation.

40. If Plaintiff entered into the Ford Program, his monthly payment under the Income Contingent Repayment Program option would be $826.15 for 300 months, based on his reported household adjusted gross income of $66,029 and a family size of 2, as reported in Plaintiff's 2016 federal income tax return.

41. If Plaintiff entered into the Ford Program, his monthly payment under the Standard Repayment Program option would be $2,617.00 per month for 300 months.

42. If Plaintiff entered into the Ford Program, his monthly payment under the Extended Repayment Program option would be $2,492.00 per month for 360 months.

43. If Plaintiff entered into the Ford Program, his monthly payment under the Graduated Repayment Program option would be $2,278.00 per month for the first 12 months, for 300 months.

Pre-Trial Order [ECF No. 26], Stip. Fact ¶¶ 1-43.

## EVIDENCE PRESENTED AT TRIAL

At trial, the Court heard the testimony of two witnesses and received 17 exhibits into evidence.  Plaintiff testified at trial, but called no other fact witness and no expert witnesses.  [Tr. 11:2-112:7].[2]  ECMC cross-examined Plaintiff on all relevant topics.  After Plaintiff rested, Education Credit Management Corporation called Jesse Ogren ("Ogren"), a vocational expert, to offer an opinion on Mr. Lozada's employment prospects. [*See* Tr. 114:2-131:25].

While the Court found Mr. Lozada earnest and credible, his testimony did not, in any significant measure, supplement the facts to which he had stipulated pre-trial, which were seemingly fatal to his claim of undue hardship.  Plaintiff testified at trial regarding his educational background and employment history [*see* Tr. 12:23-13:14], his student loan debt [*see, e.g.*, Tr. 16:10-19:4], his finances [*see* Tr. 46:1-48:18], and his medical condition [*see* Tr. 57:13-59:6].

Mr. Lozada earned a Bachelor of Arts degree from City College. Pre-Trial Order. [Tr. 13:14-14:8]; *see also* Pre-Trial Order [ECF No. 26], Stip. Fact ¶ 14.  While working full time, when he was thirty-eight years-old, Mr. Lozada enrolled at Brooklyn Law School. [Tr. 14:22-15:6]; *see also* Pre-Trial Order Pre-Trial Order [ECF No. 26], Stip. Fact ¶38.  He aspired to be a lawyer because, growing up, he encountered "a lot of injustices" and "saw a lot of people hurting because they either didn't understand the legal system or were unable to . . . get a lawyer." [Tr. 14:10-21].  Mr. Lozada graduated from law school in 1989 [Tr. 17:12-14], but did not pass the bar exam on his first attempt. [Tr. 15:8-19].  He did not sit for the bar exam again, and as a result was not admitted to practice law. [Tr. 15:8-16:1].  Despite having a law degree, Mr. Lozado

---

[2] "Tr. __:__" refers to the transcript of the August 21, 2018, trial, filed on the electronic docket of this adversary proceeding at ECF No. 29.

never sought employment in a law-related field or otherwise made professional use of his legal education.

Mr. Lozada has spent his career working in social services and in the not-for-profit sector. [*See, e.g.,* Tr. 12:23-13:14]. Primarily, Mr. Lozada worked with the Central Board of Education to implement substance abuse prevention programs throughout the city. [Tr. 16:3-11]. He explained that he found it difficult to maintain steady employment because the funding for his employment projects would expire and not be renewed. [Tr. 18:21-23]. Mr. Lozada's most recent employment ended in December 2014 when, as a result of a change in leadership, Prison Ministries, the non-profit for which he worked, charted a "new direction" and determined that Mr. Lozada did not "fit into what they were looking for." [Tr. 36:4-16].

Plaintiff also testified, in contradiction to what he stipulated pre-trial, that he searched for employment during most of 2015. [Tr. 96:8-17]. Plaintiff claims that he submitted his resume to at least 100 online job listings throughout 2015 [Tr. 96:8-17], but was unsuccessful in finding employment. [Tr. 96:8-17]. Somewhere around 2015, Mr. Lozada and his wife used their "retirement fund of about $90,000" in an unsuccessful attempt to "start a daycare center." [Tr. 39:5-14]

> So we started doing all the research and putting together a business plan and so forth and eventually we were able to submit an application to the city to start a daycare center and we took that money and put it into – into that business, trying to start that business. Daycare businesses in the city, as I came to know, a very complicated matter. And what happened was, we had to actually rent the place, have the place set up for them to look and see if it met the requirement before they could – they would issue a permit so we could start the business.
>
> They told me originally it would take three months. It took over a year. In the span of that year, we were paying rent because we had to get the place in order for even them to consider giving us a permit . . . . And what happened in the span of that time is that all the seed money that we had set aside for that got all eaten up.

So, by the time they were ready to issue us a permit, we had no more money, so
we couldn't proceed. . . . I mean, it was a nightmare dealing with that process.
So, our expectation were if we get a business going, that will provide enough
income not just to pay the student loan but for us to be able to live and, you know,
have a future. And it just wasn't to be.

[Tr. 39:15-40:15].

Mr. Lozada testified that he is no longer seeking employment, [Tr. 83:7-8], and

now considers himself retired. [Tr. 83:23-24]; *see also* Complaint [ECF No. 1], ¶¶ 15, 23

(retired as of 2014); Pre-Trial Order [ECF No. 26], Stip. Fact ¶ 9. Mr. Lozada testified

that despite working full time at the Board of Education while in law school, he could

only afford tuition by taking out student loans. [Tr. 14:24-15:19]. When he graduated in

1989, Mr. Lozada owed about $40,000 in student loan debt. [Tr. 17:1-10]. Starting in

1990, Mr. Lozada paid $500 a month towards his student loan, and he continued to make

payments "to about 1994." [Tr. 17:10-24]. Over the course of the next twenty years, Mr.

Lozada consolidated his loans several times, took out and consolidated a Parent Plus loan

for his son to attend St. John's University, and continued to pay the loan intermittently

when he was employed. [*See, e.g.*, Tr. 17:10-35:18].

At trial, Mr. Lozada testified that he applied several times for an income-based

repayment plan, but his loan servicer told him he did not qualify for such a plan "and they told

[Mr. Lozada] they were giving [him] – they were rolling it over, just rolling it over [as

forbearances and deferments.]" [*See, e.g.*, Tr. 91:1-91:24]. Mr. Lozada's loan servicer put the

loans into forbearance for five years beginning in 1994. [Tr. 18:20-20:14]. Between April 2005

and May 2017, Mr. Lozada received either a deferment or a forbearance for his loans for a total

of 80 months. Pre-Trial Order [ECF No. 26], Stip. Fact ¶¶ 25-27. Mr. Lozada has not made a

payment on the loan since 2015. [Tr. 35:6-18].

Mr. Lozada stipulated that he is eligible to enter the William D. Ford Direct Loan Consolidation Program and that under this program his monthly payment under the Income Contingent Repayment Program would be $826.15 for 300 months.  [Tr. 108:14-21]; *see also* Pre-Trial Order [ECF No. 26], Stip. Fact ¶¶ 39, 40.

Mr. Lozada's sole source of income is $1,296.00 in monthly benefits from Social Security. [Tr. 41:8-17]; [Rafael Lozada Social Security Benefit Statement, PX A].[3]  His wife contributes $4,685 a month to the household's income. [*See* PX C and D].  Plaintiff and his wife have a combined monthly income of no less than $5,942 per month.  [Tr. 101:4-16]; *see also* Pre-Trial Order [ECF No. 26], Stip. Fact ¶ 38.

Mr. Lozada's testimony demonstrated that he is a charitable man, who regularly tithes, apportioning at least 10% of his income to his church.  [*See, e.g.*, Tr.47:23-48:9].  When he can give more, or when a community member is in need, he and his wife donate additional amounts. [Tr. 79:3-80:15].   In total, Mr. Lozada and his wife donated over $100,000 in the five years leading up to bankruptcy. [*See* Tr. 79:3-80:1]; Pre-Trial Order [ECF No. 26], Stip. Fact ¶ 33.

Mr. Lozada testified that his monthly household expenses amount to $4,499. [Tr. 99:7-100:16].  Approximately $100 of this amount is attributable to out-of-pocket medical expenses.  [Tr. 47:8-12].  As Mr. Lozada explained, he suffers pain daily from doing routine activities, has undergone cataract surgery, and takes various medications. [*See* Tr. 58:2-60:22].  Mr. Lozada alleges that his health issues are among the causes that prevent him from working.  [Tr. 83:9-14].  He, did not, however, offer any admissible medical records or otherwise call any treating physicians or medical experts with respect to his condition, diagnosis, or his prognosis. [Tr. 60:13-61:5].

---

[3] PX A refers to Plaintiff's Exhibit A.  Other Plaintiff's Exhibits will be referred to throughout as PX followed by the exhibit letter.  Defendant's Exhibits will be referred to throughout as DX followed by the exhibit letter.

ECMC called Ogren, a certified educational rehab counselor and licensed professional counselor, who opined that he believes Plaintiff should be able to find employment. Ogren testified that he was able to find job listings for which Mr. Lozada is qualified and which he may be able to attain. [Tr. 123:6-19]. These jobs offered a salary of about $40,000. [Tr. 123:6-19]. On cross examination Ogren acknowledged that he has never worked with someone with Mr. Lozada's unique work background, and he could not recall if he has ever successfully placed a job seeker who is 65 or older. [Tr. 130:2-131:21].

## DISCUSSION

"Congress intended that student loans be discharged in rare cases of exceptional circumstances." *In re Jackson*, No. 05-15085 (PCB), 2007 WL 2295585, at *4 (Bankr. S.D.N.Y. Aug. 9, 2007); *see also In re O'Hearn*, 339 F.3d 559, 564 (7th Cir. 2003). As ECMC argued at trial, "[i]f it were simply easy to walk away from these obligations, the program's integrity would fall apart and there would be no program." [Tr. 7:19-21]. The Second Circuit has explained that Congress enacted section 523(a)(8) in order to preserve the solvency of student loan programs "because there was evidence of an increasing abuse of the bankruptcy process that threatened the viability of educational loan programs . . . ." *In re Renshaw*, 222 F.3d 82, 87 (2d Cir. 2000).

The Bankruptcy Code reflects this policy :

"(a) A discharge under section 727, 1141, 1228(a)9, 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-. . .

(8) *unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents*, for-

(A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

10

        (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

        (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

11 U.S.C. § 523 (emphasis added).

A debtor who seeks to discharge student loan debt bears the burden of demonstrating undue hardship by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991) (holding that "the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard"). The statute itself provides little guidance on how to determine whether an undue burden exists. In *Brunner v. New York State Higher Education Services Corporation*, the Second Circuit articulated what has become the standard test for determining whether a debtor would face an undue hardship if his student loans were not discharged. 831 F.2d 395 (2d Cir. 1987). *See In re Frushour*, 433 F.3d 393, 400 (4th Cir. 2005) (listing the circuits that have adopted the *Brunner* test); 4 Collier on Bankruptcy ¶ 523.14 (16th 2018) (describing *Brunner* as the most widely used test).

Under the *Brunner* test, a debtor must make the following three-part showing:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396. The analysis at issue "requires courts to consider the unique or extraordinary circumstances of a particular situation on a fact-intensive, case-by-case approach." *In re Jackson*, No. 05-15085 (PCB), 2007 WL 2295585, at *4.

A. <u>Minimal Standard of Living</u>

Under the first prong of the *Brunner* test, Mr. Lozada must establish, based upon his current income and expenses, that he cannot both maintain a minimal standard of living and repay his student loans. *Brunner*, 831 F.2d at 396. The Second Circuit has made clear that this prong of the *Brunner* test is "the minimum necessary to establish 'undue hardship.'" *Id.*

This is a challenging standard for debtors to meet, since a debtor must "demonstrate more than tight finances, although a debtor is not required to live at or below the poverty line." *See In re Elmore*, 230 B.R. 22, 26 (Bankr. D. Conn. 1999). "A debtor must demonstrate financial circumstances that [go] beyond the 'garden-variety financial hardship' that most debtors experience." *In re Jean-Baptiste*, 584 B.R. 574, 587 (Bankr. E.D.N.Y. 2018). While it is not the Court's role to impose, *ad hoc*, a certain standard of living on the debtor, or to author his budget, the Court is required to "review the reasonableness of the Debtor's budget—particularly the allocation of projected expenses in relation to projected income as it determines his capabilities to pay the instant obligations without undue hardship." *In re Pincus*, 280 B.R. 303, 317 (Bankr. S.D.N.Y. 2002).

One unique consideration in evaluating Mr. Lozada's projected budget is the fact that Mr. Lozada and his wife regularly contribute 10% of their income to the Church. [Tr. 47:23-25]; Pre-Trial Order [ECF No. 26], Stip. Fact ¶¶32-34. In addition, he and his wife give additional amounts to charity whenever there is a need or a request for help. [*See, e.g.*, Tr. 80:2-23]. In total, Mr. Lozada made donations of $12,678 in 2012, $24,783 in 2013, $21,866 in 2014, $21,544 in 2015, and $23,510 in 2016. Pre-Trial Order [ECF No. 26], Stip. Fact ¶¶32-34. As a threshold matter, the Court must consider whether Plaintiff's tithing and charitable donations

must be included, or excluded, for the purposes of assessing whether his expenses are reasonable for his circumstances.  There is surprisingly little case law on point within this Circuit.

In 1998, Congress, through the enactment of the Religious Liberty and Charitable Donation Protection Act, 11 U.S.C. § 1325(b)(2)(A)  ("RLCDPA"), "amended several sections of the Bankruptcy Code to exclude 'charitable contributions' totaling less than fifteen percent of the debtor's gross annual income from consideration by the bankruptcy courts for various purposes."  *In re Savage*, 311 B.R. 835, 842 (B.A.P. 1st Cir. 2004).  Congress did not, however, include section 523(a)(8) among those amended provisions.  "As a result, there is a split of authority as to whether Congress intended religious and charitable donations to be permissible expenses in determining undue hardship under § 523(a)(8)." *Id.*[4]

In *In re Lebovits*, the court held that the RLCDPA nonetheless applied to the undue hardship analysis and concluded that the debtor's contribution in that case, which fell far below the fifteen percent threshold, was well within the permissible limits set by Congress, and therefore did not undercut the Court's finding that the debtor in that case satisfied the minimal standard of living prong under *Brunner*.  223 B.R. 265, 273 (Bankr. E.D.N.Y. 1998). *But see In re Lynch*, 299 B.R. 62, 74 (Bankr. S.D.N.Y. 2003) (holding a debtor's federal income tax debt nondischargeable where her tithing of $20,000-a-year was not required and therefore was not a necessary expense).  ECMC argues that religious and charitable donations preclude debtors from satisfying *Brunner's* first prong and cite to *In re Fulbright*. 319 B.R. 650 (Bankr. D. Mont. 2005).  There, the court held "that religious and significant charitable donations are per se not proper expenses in determining whether discharging student loan debt would result in undue

---

[4] Plaintiff's argument that section 707(b)(1) "even orders a court not to take into consideration whether a debtor makes charitable contributions" misstates the scope of that section, which deals with dismissal of a chapter 7 case for "cause."

hardship," *Id.* at 660, and held that that debtor failed to show he could not repay his loan while

maintaining a minimal standard of living.

The Court agrees that, "any interpretation that expressly allows or disallows tithing

should be rejected as both interpretations seem to amend [section] 523(a)(8) when Congress did

not." *In re McCafferty*, No. 14-04545-FPC7, 2015 WL 6445185, at *6 (Bankr. E.D. Wash. Oct.

23, 2015) (citing *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990)

("We will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear

indication that Congress intended such a departure.")).  Since Congress has not provided explicit

guidance on this issue, charitable giving, while commendable, cannot *per se* be exempted from

contractual obligations.[5] Instead, charitable giving expenses, such as Mr. Lozada's tithes, must

be evaluated on a case-by-case basis, "considering factors such as the amount and the debtor's

history in order to determine whether, for that particular debtor, tithing constitutes a reasonably

necessary expenditure." *In re McCafferty*, 2015 WL 6445185, at *6.  *See also Educ. Credit*

*Mgmt. Corp. v. Rhodes*, 464 B.R. 918, 923 (W.D. Wash. 2012) (holding that the bankruptcy

court "erred in failing to examine the appropriateness of [that debtor's] monthly contributions to

[his religion]"); *cf In re Cline*, 248 B.R. 347, 351 (B.A.P. 8th Cir. 2000) (upholding the

bankruptcy court's finding that a $25 monthly tithing was modest and reasonable under the

circumstances).  While the Court respects Mr. Lozada's commitment to charity, the reality is that

when he elects to tithe rather than pay his nondischargeable debt, he is making donations using

---

[5] The Court's analysis here is confined to how tithing factors into a determination of whether a plaintiff can maintain a minimal standard of living if required to repay his student loans under section 523(a)(8).  The Court's analysis does not concern or impact in any respect Plaintiff's constitutional right to practice his religion.  "Plaintiffs alone can decide whether they can or should make donations to their church, and the Court does not presume to interfere with that decision." *In re Ritchie*, 254 B.R. 913, 921 (Bankr. D. Idaho 2000).  Mr. Lozada did not argue that section 523(a)(8) as applied to these facts is unconstitutional, and accordingly the Court is not deciding that issue.  Nevertheless, the Court notes that at least one court has held that section 523(a)(8) as applied under similar facts is neutral, not intended to prohibit the practice of religion, and dos not violate the debtor's First Amendment rights.  *In re Lynn*, 168 B.R. 693, 700 (Bankr. D. Ariz. 1994); *cf In re Rivera*, 214 B.R. 101, 108 (Bankr. S.D.N.Y. 1997)

14

someone else's money.  As such, the Court, in evaluating the first *Brunner* prong will consider

Mr. Lozada's charitable donations totaling over $100,000 in the five years preceding his

bankruptcy, *see* Joint Pre-Trial Order [ECF No. 26], Stip. Fact ¶¶ 32, 33, in the context of his

overall financial condition.

In addition to his charitable contributions, Mr. Lozada testified that he spends

approximately $4,499 on monthly expenses.  [Tr., 99:7-100:16].  Plaintiff approximated the

breakdown of his expenses as following:

| | |
|---|---|
| Rent | $ 2500 |
| Electric | $ 130 |
| Gas | $ 40 |
| Water | $ 15 |
| Cable | $ 100 |
| Cellphone | $ 100 |
| Food and Supplies | $ 500 |
| Clothing and Laundry | $ 100 |
| Personal care | $ 100 |
| Medical out of pocket | $ 100 |
| Transportation | $ 200 |
| Entertainment | $ 100 |
| Car Loan | $ 314 |
| Car Insurance | $ 200 |

[Tr., 99:7-100-25].

As stipulated pre-trial, Mr. Lozada's monthly household income is not less than $5,942.

Pre-Trial Order [ECF No. 26], Stip. Fact ¶ 38.  This amount is predominately attributable to Mr.

Lozada's wife who earns $3,466 from her pension and another $1,219 from social security. [*See*

Pl.'s Exs. C and D].  It is well established "that total household income, including that of a non-

debtor spouse, live-in companion, life partner and contributing co-habitant, must be considered

in conducting this minimal standard of living analysis, as well as its relevance in generally

determining undue hardship under the Bankruptcy Code." *In re Davis*, 373 B.R. 241, 248

(W.D.N.Y. 2007)(collecting cases); *see also In re French*, No. 04-03060, 2006 WL 2583646, at

*4 (Bankr. S.D.N.Y. Aug. 31, 2006).  Accordingly, crediting Mr. Lozada's $4,499 estimation at

trial of his expenses, Mr. Lozada has at least $1,400 a month in surplus income that he can apply

towards paying his student loans.

Moreover, the Court views some of Mr. Lozada's expenses as excessive in light of the

sacrifice expected of an individual obligated to repay his student loan obligation.  Specifically,

Mr. Lozada's expenses with respect to rent, food, transportation, entertainment, and charitable

donations are excessive under the circumstances.  Earlier this year Mr. Lozada and his wife

moved from an apartment in the Bronx to an apartment in Stamford, Connecticut. [Tr. 65:10-

66:7].  Mr. Lozada's move significantly increased his expenses.  While living in the Bronx he

paid $867 a month for rent.  [Tr. 66:22-24].  Now, however, he pays $2,500 a month for rent,

[Tr. 99:8-11], tripling his rent obligations.  The Court is sympathetic to the fact that, due to Mrs.

Lozada's medical condition, Mr. Lozada and his wife had to relocate from the Bronx apartment

to an apartment building with a reliable elevator. [*See* Tr. 67:1-12].  Nevertheless, to suggest that

there were no suitable homes available at a lower rent strains credulity.  Moreover, moving from

the Bronx to Stamford, Connecticut, undoubtedly increased the need for Debtor to own (and use)

a car, totaling $514 a month in expenses, in addition to the $200 he attributed to transportation

during his testimony.

Mr. and Mrs. Lozada spend approximately $500 a month on food because they frequently

dine out. [Tr. 76:22-77:7].  A debtor is not required to abstain entirely from dining out to satisfy

the first prong of the *Brunner* test, but the Plaintiff's practice of frequently dining out is

problematic. This is made clear by the fact that the government estimates that the average cost of

food for a similarly situated family of two, in July 2018, was $366.10 under a Thrifty plan or

$472.70 under a Low-cost plan.  U.S. DEP'T OF AGRICULTURE. COST OF FOOD AT HOME AT FOUR

LEVELS, U.S. AVERAGE, JULY 2018 *available at*

https://www.cnpp.usda.gov/sites/default/files/CostofFoodJul2018.pdf.

The $500 a month Mr. Lozada allocates towards food must be considered with Mr.

Lozada's other expenses.  Mr. Lozada estimated at trial that he spends $100 a month on

"entertainment," the same amount that he attributes to out of pocket medical expenses.   As

explained above, Mr. Lozada donates a significant amount to religious organizations and

charities.  Mr. Lozada gives his granddaughter a weekly allowance of between $25 and $30, Pre-

Trial Order [ECF No. 26], Stip. Fact ¶ 29, and he provides money to adult children even though

they are not his dependents. Pre-Trial Order [ECF No. 26], Stip. Fact ¶ 30.  In 2016 he paid

$1,100 a month to rent an apartment in Florida while he maintained a home in New York, [Tr.

71:9-19], he has taken multiple trips to Puerto Rico to visit his father, and in 2014 Mr. Lozada

went on a family vacation to Virginia Beach.  [Tr. 85:21-86:14].

In short, Mr. Lozada enjoys a sizable monthly surplus.  His expenditures indicate that he

lives a comfortable lifestyle and the record does not reveal any efforts to minimize discretionary

expenses. Based on this record, it simply is not the case that Plaintiff has minimized his expenses

as required in order to satisfy the first prong under *Brunner*.

B.  Persistence of Current Financial Condition and Additional Circumstances

The second prong of *Brunner* requires that Plaintiff demonstrate that his current financial

condition is likely to persist for a significant portion of the repayment period of the student loans.

*Brunner*, 831 F.2d at 396.  Under this prong, the Court must "make a predictive judgment as to

the likelihood that a debtor's financial hardship will continue for a significant portion of the

repayment period."  *In re Kenny*, 313 B.R. 100, 107 (Bankr. N.D.N.Y. 2004).

There are two elements to this prong.  The first element is whether the debtor's financial difficulties are "likely" to continue.  Under this standard a debtor must establish by a preponderance of the evidence that his financial situation is not likely to improve. *In re Crawley*, 460 B.R. 421, 438 (Bankr. E.D. Pa. 2011).  Implicit in this requirement is that the debtor demonstrate that he has made, or is currently making, diligent efforts to secure stable employment or demonstrate that he is unemployable. *In re Jones*, 392 B.R. 116, 128 (Bankr. E.D. Pa. 2008).  The second element requires a showing that the financial difficulties are likely to persist for a significant portion of the repayment period.  *Id.*  To satisfy both elements a debtor must prove that there are "unique and exceptional circumstances, beyond [his] control . . . that would prevent future employment and the ability to repay the debt." *In re Benjumen*, 408 B.R. 9, 16 (Bankr. E.D.N.Y. 2009).  For example, courts frequently find that debtors have satisfied the second *Brunner* prong where the debtor establishes that he suffers from serious illnesses or disabilities.  *See, e.g.*, *In re Jackson*, No. 05-15085 (PCB), 2007 WL 2295585, at *6 (Bankr. S.D.N.Y. Aug. 9, 2007).

Here, the Court substantially credits the Plaintiff's testimony about the effects that he suffers from a variety of conditions that negatively impact him.  For instance, Mr. Lozada testified that he has diabetes, increased dry eyes, "herniated discs in [his] spine" for which he receives physical therapy, and has "tears in [his] rotator cuffs in both of [his] shoulders" for which he has completed physical therapy.  [Tr., 58:1-61:4].  As a result, he cannot lift heavy objects.  [Tr. 58:2-19].  The Court cannot however, based solely on Plaintiff's testimony, evaluate the extent to which the conditions about which Plaintiff complains negatively impact his ability to work. Moreover, the Court's own observations of the debtor and consideration of his education suggest he is capable of working in some capacity.

18

For the purposes of the *Brunner* analysis, it is critical that the debtor establish an unpromising prognosis (*i.e.,* persistence). While a debtor is able to testify about his own limiting physical conditions, Mr. Lozada was not competent to testify as to his prognosis based on the conditions he described. *In re Traversa*, No. 06-31447 (LMW), 2010 WL 1541443, at *10 (Bankr. D. Conn. Apr. 15, 2010) (holding that the debtor failed to satisfy the second *Brunner* where that debtor failed to create a sufficient record to demonstrate that his medical condition negatively impacts his ability to earn a living because he did not introduce documentary or expert testimony with respect to his ailments); *In re Congdon,* 365 B.R. at 438–39; *Norasteh v. Boston University (In re Norasteh),* 311 B.R. 671, 678 (Bankr.S.D.N.Y.2004) (Noting that "[a]t a minimum, . . . a borrower seeking . . . 'an undue hardship' discharge must provide corroborative evidence that he had an impairment that prevents him from earning enough to repay his student loans, and that the impairment is likely to persist well into the future," and concluding that Debtor failed to satisfy the second *Brunner* prong because he did not "submit medical reports identifying his symptoms, diagnosing his condition, or indicating its severity or probable duration"). "A judge can observe the witness and hear him describe his symptoms, but a judge cannot make a diagnosis or determine the severity of the impairment based on that alone." *In re Norasteh*, 311 B.R. 671, 678 (Bankr. S.D.N.Y. 2004).

In this case, given the absence of competent medical evidence, the Court cannot conclude that a 68-year-old who is highly educated, computer literate, and who routinely drives [Tr. 103:11-13] is incapable of working even in a sedentary capacity. Mr. Lozada acknowledged that he is capable of some employment, offering at trial that he likely could work "part-time [at] McDonalds." [Tr. 109:1-7]. And yet, Mr. Lozada confirmed that he is not currently seeking employment. [Tr. 83:7-8]. The Court concludes that Mr. Lozada has failed to carry his burden

of proof with respect to the second prong of *Brunner* and therefore is not entitled to a discharge with respect to his student loan debt.

C. <u>Good Faith Effort to Repay the Loans</u>

The third prong of the *Brunner* test requires that the Plaintiff demonstrate that he made a good faith effort to repay his student loans. *Brunner*, 831 F.2d at 396. A finding of good faith "turns on several considerations, including the debtor's efforts to obtain employment, maximize his income, minimize his expenses, and participate in alternative repayment options." *In re Norasteh*, 311 B.R. 671 at 676.

As previously noted, Mr. Lozada failed the bar exam on his first attempt and decided not to take it again. [Tr. 15:8-16:1]. Even after obtaining a law degree, he did not seek out any law related employment, opting instead to work in the social services field. While his decision to work in social services is laudable and the Court commends him for his sense of duty to serve, Mr. Lozada benefitted from his student loans and he is obligated to repay his debt. The unfortunate truth is that in the face of significant debt, Mr. Lozada limited his income and his prospects for finding work. By his own admission he has not looked for work for more than three years and considers himself retired. Pre-Trial Order [ECF No. 26], Stip. Fact ¶¶ 9, 22. "In essence, the record reflects that the Plaintiff has not sought to maximize his income." *In re Marlow*, No. 11-34018, 2012 WL 4829424, at *13 (Bankr. E.D. Tenn. Oct. 10, 2012), *aff'd,* No. CIV.A. 3:13-24, 2013 WL 3515726 (E.D. Tenn. July 11, 2013), *aff'd* (Apr. 23, 2014). As discussed above, Mr. Lozada also has not made efforts to minimize his expenses

The evidence presented at trial does demonstrate that Mr. Lozada initially made good faith efforts to repay his debt. From 1990 to 1994 he paid $500 a month towards his loans. In 1994, however, the funding for his employment expired, and he was laid off. [Tr. 18:21-23].

20

Mr. Lozada approached the entity holding his loans, explained his situation, and asked for

options. [Tr. 19:12-16].  As a result, Mr. Lozada's obtained a forbearance. [Tr. 19:12-23].  Mr.

Lozada testified at trial that in 2003 he requested to enroll in an income-based repayment

program, a program that could reduce significantly his monthly payments, Pre-Trial Order [ECF

No. 26]. Stip. Fact ¶¶40-43, but his loan servicer rejected his application stating he did not

qualify for it.  [Tr. 91:9-14].  Instead, when Mr. Lozada could not find employment, the servicer,

year after year, granted forbearances and deferments. [Tr. 91:13-24].

Mr. Lozada's initial payments on his loans are certainly indicative of good faith.  *See In

re Wells*, 380 B.R. at 662; *French v. NCO Financial Systems* (*In re French*), No. 04-40365, 2006

WL 2583646, at *7 (Bankr. S.D.N.Y. Aug. 31, 2006) ("a history of loan repayment can serve as

evidence of good faith[,] [but it] is only one factor to be considered in the overall determination .

. . .").  Additionally, Mr. Lozada's requests for income-based repayment plans and his

obtainment of deferments and forbearances also provides some indication of good faith. *See In re

Pincus*, 280 B.R. at 316-17 (finding that the debtor exhibited good faith when, *inter alia*, he

requested forbearances on three separate occasions); *In re Carlson-Callow*, 2008 WL 2357012,

at *8 (finding good faith where, *inter alia*, the debtor obtained several deferments and

forbearances).

The Court notes that ECMC and Mr. Lozada have stipulated that Mr. Lozada is eligible

to enter the William D. Ford Direct Loan Consolidation Program.  Pre-Trial Order [ECF No. 26],

Stip. Fact ¶ 39.  If Mr. Lozada entered into the Ford Program, his monthly payment under the

Income Contingent Repayment Program would be $826.15 for 300 months.  Pre-Trial Order

[ECF No. 26], Stip. Fact ¶ 40.  Given that Mr. Lozada enjoys a monthly surplus of at least

$1,400, there is no question he could afford to pay $826.15 per month to pay his student loan

obligation and continue to maintain a minimal standard of living.

ECMC argues that debtors who fail to avail themselves to income contingent repayment

programs cannot establish good faith.  A debtor's decision to forgo enrolling in an income-based

repayment plan is not, in and of itself, fatal to a finding of good faith, but is one of many factors

to be considered when evaluating the debtor's good faith.[6]  *In re Benjumen*, 408 B.R. 9, 24

(Bankr. E.D.N.Y. 2009); *In re Johnson*, 299 B.R. 676, 682 (Bankr. M.D. Ga. 2003) (holding that

a debtor's good faith does not rest exclusively on his willingness to participate in the Income

Contingent Repayment Program).

Based on his trial testimony, there is no question that Mr. Lozada feels the weight of his

student loan obligation.  He testified that his understanding is that he can either pay the amount

the company is requesting, and if he does not "the recourse would be for them to, I guess, get a

judgment against my Social Security check and take a certain percentage of that check." [Tr.

106:17-22].  Mr. Lozada provided sincere and emotional testimony at trial, explaining that he

brought this case to go "through a process [for] some kind of solution" and that he did not "ever

want to give the impression that [he] just [does not] care or . . . ." [Tr. 107:6-14].

However, the Court cannot ignore that Mr. Lozada has received annual tax refunds of

$2,676, $3,852, $5,037, and $4,609 for the years 2012, 2013, 2014, and 2016 respectively, Pre-

Trial Order [ECF No. 26], Stip. Fact ¶ 35, but did not use any of these funds to pay down his

---

[6] Some debtors demonstrate good faith even though they decide to refrain from an income-based repayment plan. As courts have recognized, "by enrolling in an alternative repayment plan, [debtors] would incur a potentially nondischargeable tax obligation pursuant to 11 U.S.C. § 523(a)(1), for the amounts forgiven under the repayment plan." *In re Benjumen*, 408 B.R. 9, 24 (Bankr. E.D.N.Y. 2009) (citing *Allen v. Am. Educ. Servs. (In re Allen)*, 324 B.R. 278, 281–282 (Bankr. W.D. Pa. 2005); *Durrani v. Educ. Credit Mgmt. Corp. (In re Durrani)*, 311 B.R. 496, 508 (Bankr.N.D.Ill.2004)).  If courts accepted that debtors must enroll in income based repayment programs the result would be that debtors could simply be "trading one nondischargeable debt for another." *In re Barrett*, 487 F.3d 353, 364 (6th Cir. 2007).

student loan debt. Pre-Trial Order [ECF No. 26], Stip. Fact ¶ 36.  Similarly, Mr. Lozada did not

use any of the $30,000 he inherited in 2015 towards repaying his student loan debt.  Pre-Trial

Order [ECF No. 26], Stip. Fact ¶ 37.  And as discussed above, Mr. Lozada has contributed more

than $100,000 to charity in recent years while neglecting his loan obligations.  If Mr. Lozada had

used the money from his tax refunds, his inheritance, and his charitable contributions *solely from

the 5 years preceding his bankruptcy filing*, he could have paid down close to half of his

$309,694.24 student loan debt as of the date he filed for bankruptcy.  *See* [ECF No. 1], Schedule

E/F.  This would have had a significant impact, particularly in light of the fact that the 8.25%

annual interest on his loan compounds on a daily-basis.  "Where a debtor has had the opportunity

to repay an amount, but did not; where '[n]o factors beyond [the] [d]ebtor's reasonable control

precluding repayment have been suggested,' and where the debtor simply ignores his obligation,

such conduct does not satisfy the third prong of the *Brunner* test."  *In re Hixson*, 450 B.R. 9, 22–

23 (Bankr. S.D.N.Y. 2011) (quoting *Lehman v. N.Y. Higher Educ. Servs. Corp. (In re Lehman),*

226 B.R. 805, 809 (Bankr. D. Vt. 1998)).

Although his payments and requests for alternative plans early on are indicative of good

faith, they are not sufficient to support a finding of good faith effort to repay the loans when

viewed against the backdrop of all the relevant circumstances.  The factual record clearly

demonstrates that Mr. Lozada did not make an effort to maximize his income to repay his student

loan debt.  Similarly, the record reflects that he did not minimize his expenses or use his excess

income to repay his student loan debt.  Mr. Lozada's failure to consider enrolling in an income-

based repayment plan since his retirement, particularly when viewed in the context of his lack of

effort to seek employment or to minimize his expenses, weighs heavily against a finding of good

faith.  Based on the totality of the facts before it, the Court concludes that Mr. Lozada has failed

to meet the good faith requirement of *Brunner*.

In sum, Plaintiff has failed to carry his burden with respect to each prong of the *Brunner*

test.  Therefore, the Plaintiff's request for a discharge of the loan to Educational Credit

Management Corporation must be denied under § 523(a)(8).

## CONCLUSION

For the forgoing reasons, Plaintiff's debt to Educational Credit Management Corporation

is not dischargeable.  Educational Credit Management Corporation is directed to settle a

judgment in accordance with this decision, on no less than 5 business days' notice to all parties

in interest.

It is so **ORDERED.**

Dated:     New York, New York
           November 16, 2018

                                         *s/ Mary Kay Vyskocil*
                                         Honorable Mary Kay Vyskocil
                                         United States Bankruptcy Judge